# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

DAVID GOODMAN,

          Plaintiff,

vs.

PERFORMANCE CONTRACTORS,
INC., et al.,

          Defendants.

No. C17-4062-LTS

**MEMORANDUM OPINION AND
ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

---

This case is before me on defendants' motion (Doc. No. 63) for summary judgment. Plaintiff David Goodman has filed a resistance (Doc. No. 68) and defendants have filed a reply (Doc. No. 78). I heard oral arguments on January 22, 2019. The motion is fully submitted and ready for decision. Trial is scheduled to begin March 4, 2019.

## I.  INTRODUCTION

On August 21, 2017, Goodman filed a petition (Doc. No. 2-2) in the Iowa District Court for Woodbury County against Performance Contractors, Inc. (PCI), Kelly Pabst and Derek Racca, in which he made allegations about events that occurred while he was employed at a PCI construction site in Sergeant Bluff, Iowa. This case was removed to this court on October 6, 2017, on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. In his state court petition, Goodman asserted claims for (1) discrimination on the basis of race and retaliation in violation of the Iowa Civil Rights Act, Iowa Code Chapter 216 (ICRA) and (2) defamation. Doc. No. 2-2. Goodman filed an amended complaint (Doc. No. 23) on January 23, 2018, in which he added a third count alleging

discrimination on the basis of race and retaliation in violation of Title VII of the Civil Rights Act of 1964.[1]  *Id.*

On February 2, 2018, Goodman dismissed Pabst as a defendant.  Doc. No. 28. Thus, as currently situated, Count I asserts retaliation and discrimination claims, against PCI only, pursuant to the ICRA; Count II asserts defamation claims against PCI and Racca; and Count III asserts retaliation and discrimination claims, against PCI only, pursuant to Title VII.

## II.    RELEVANT FACTS

The following facts are undisputed, except where noted otherwise.

PCI is a private industrial construction contractor, headquartered in Baton Rouge, Louisiana.  PCI engages in industrial construction throughout the United States in various industries including fertilizer, chemical and steel.  PCI was hired by CF Industries to construct and expand a fertilizer plan in Sergeant Bluff, Iowa.  The project began in 2013.  Goodman began work as a rigger[2] at the Sergeant Bluff site on September 21, 2015.  In mid-October 2015, Goodman was assigned to work with crane operator Kelly Pabst.  Derek Racca was another employee who knew Pabst and had worked with Goodman on one occasion.[3]

---

[1] In the amended complaint, the title of count 3 includes harassment based on race, though the contents of the complaint do not contain that claim.  Doc. No. 23.  Defendants argue that summary judgment is appropriate on Goodman's harassment claim.  Doc. No. 63-1 at 8–12. Goodman does not appear to be arguing a harassment claim and, in any case, stating "[t]o the extent Plaintiff plead [sic] any separate claim for race harassment . . . Plaintiff does not resist dismissal of such claim."  Doc. No. 74 at 1.

[2] As a rigger, Goodman would guide crane operators who were using cranes to lay pipe and he would assemble rigging to lift and move equipment or materials.  Doc. No. 68-1 at 2.

[3] The record is unclear as to Racca's duties.

Goodman claims that from mid-October through mid-November 2015, Pabst made a racial comment to him or around him every other day, which included references to black people as thugs, repeating stereotypes and telling him a story in which someone else used the word "nigger." Pabst did not direct that word at Goodman and no one else at Performance referred to Goodman by that word. Goodman additionally claims that on November 10, 2015, he got coffee for Pabst and she said, "that's all you black people ever do is put a lot of cream in your coffee."[4] In response, Goodman claims he told Pabst not to stereotype him. For the remainder of that day, Goodman avoided talking to Pabst about anything other than work.

On Wednesday, November 11, 2015, Pabst made a written report to Human Resources (HR) alleging that Goodman had made threats of violence against the workplace by threatening to "shoot up" the job site. Goodman asserts that he never made any threats.[5] That same day Racca similarly told HR that Goodman had made threats of violence.[6] In response to Pabst's and Racca's allegations, Goodman was escorted off the job site that day. Both Pabst and Racca state that they spoke to Leon Strickland, a general foreman at PCI, about Goodman's threats.[7] Strickland testified that he does not recall any discussion of the alleged threats with Pabst or Racca.

On Thursday, November 12, 2015, Goodman returned to the job site to pick up his check and ask about his employment status. The parties dispute what Andrew Morel, the HR Manager, told Goodman at this meeting. Goodman argues that Morel did not tell Goodman about Pabst's and Racca's accusations, but the defendants contend that Morel

---

[4] Defendants dispute this claim, instead arguing that Pabst was discussing riggers and never said "you people" or "you black people." Doc. No. 79 at 2.

[5] The parties also dispute whether Goodman threatened to shoot up the jobsite on more than one occasion. Doc. No. 79 at 16–17.

[6] However, Racca testified that he did not believe Goodman was likely to hurt anyone.

[7] Defendants argue that Pabst thought she met with someone named "Leo or Leon or Lee" but she was "not sure on his name." Doc. No. 79 at 9.

informed Goodman about the accusations. Both parties agree that Goodman completed a written statement. In that statement, Goodman wrote that Pabst had made racially stereotyping comments "the day before yesterday" – presumably November 10—and that he objected to those comments.

On Friday, November 13, 2015, Morel contacted Corporate HR Manager Sarah Borne to ask how he should proceed. Borne instructed Morel to re-question Pabst and Racca in light of Goodman's statement. Morel called Goodman later that day and mentioned the allegations that Goodman had threatened to shoot up the job site. Goodman told Morel during that phone call that another employee named Silas Thompson had heard Pabst make racist statements. Morel never contacted Silas Thompson to discuss with him whether or not he had heard Pabst make racist statements. Goodman moved to Texas on either that same day or on Saturday, November 14, 2015.

On Monday November 16, 2015, Goodman went to PCI's office in Deer Park, Texas and completed a second written statement complaining that Pabst made false allegations against him because she thought he was going to report her to HR for her discriminatory comments. As of 11:06 a.m. on November 16, Morel had not made a final decision on whether or not to fire Goodman. Morel received Goodman's second complaint via email at 12:09 p.m. Morel sent an email at 2:01 p.m. indicating that he had decided to fire Goodman. Goodman's employment was officially terminated that day.

Additional facts will be discussed below, as necessary.

### III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998). Because the parties seek summary judgment on some of the same issues, I will consider all the parties' arguments as to each issue, keeping in mind the separate inferences that are to be drawn from each motion. *See Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

## IV.    ANALYSIS

### A.    Retaliation

#### 1.    Legal Standards

Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Title VII prohibits employers from retaliating against employees for opposing racial discrimination. *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). The ICRA also makes it an unfair discriminatory practice for "[a]ny person to . . . retaliate against another person in any of the rights protected against discrimination by

this chapter because such person has lawfully opposed any practice forbidden under this chapter." Iowa Code § 216.11(2). The ICRA retaliation provision "mirrors almost exactly" that of Title VII. *Haskenhoff v. Homeland Energy Sol. LLC*, 897 N.W.2d 553, 584 (Iowa 2017). Thus, I will analyze the state and federal retaliation claims under the same framework with the exception, as discussed below, of the causation standards.

Where, as here, a plaintiff presents no direct evidence of retaliation, the claim is analyzed under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006). The defendant then must offer a legitimate, non-discriminatory reason for the employment action. *Id.* The burden of production then returns to the plaintiff to show that this reason was a pretext for discrimination. *Id.*

To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two. *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008); *Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006). The federal statute requires a higher causation standard for retaliation claims than for discriminatory discharge claims. *Haskenhoff*, 897 N.W.2d at 584. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). In other words, the plaintiff must show the protected conduct was a determinative, not just motivating, factor in the employer's decision. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008); *see also Wright*, 730 F.3d at 737. By contrast, to prove causation under the ICRA, the plaintiff must show that the protected conduct was a "motivating factor" in the employer's adverse employment decision. *Haskenhoff*, 897 N.W.2d at 635–37; *see also Johnson v. Mental Health Inst.*, 912 N.W.2d 855, No. 16-1447, 2018 WL 351601, at *7–*8 (Iowa Ct. App. Jan. 10, 2018) (summarizing the multiple opinions in *Haskenhoff* and concluding that the

motivating factor standard now applies to retaliation claims just as it does to discriminatory discharge claims).[8]

An unsupported, self-serving allegation that an employer's decision was based on retaliation cannot establish a genuine issue of material fact. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011). Timing alone may be sufficient to create an inference of retaliation, but the Eighth Circuit has typically required more than a close temporal connection to establish a retaliation claim or show that the employer's stated legitimate reason was pretext. *Wright*, 730 F.3d at 738–39. Evidence of causation may include "evidence of discriminatory or retaliatory comments" or evidence of "a pattern of adverse action or escalating adverse actions after the protected activity." *Orluske v. Mercy Med. Ctr.-N. Iowa*, 455 F. Supp. 2d 900, 922 (N.D. Iowa 2006). A causal link may be broken if the decisionmaker for the adverse action was unaware of the protected activity. *Id.* However, an employer cannot avoid liability by using a "purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003).

Goodman argues that he can show a prima facie case of retaliation in two ways: (1) Pabst's retaliation "for [Goodman's] opposition to her inappropriate racial remarks" and (2) Morel's retaliation for Goodman's written statements and complaints about racial discrimination. Doc. No. 74 at 7, 11. I will address these individually.

### 2. Alleged retaliation by Pabst

Goodman relies on the "cat's paw" theory of liability to impute Pabst's improper retaliatory motive onto Morel. Doc. No. 74 at 9–11. This theory states that an employer

---

[8] PCI conflates the ICRA and Title VII causation standard. Doc. No. 63-1 at 12–13. *Haskenhoff*'s plurality opinion requires the less motivating factor standard for ICRA retaliation claims.

"can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (quoting *Dedmon*, 315 F.3d at 949 n.2). Typically, "cat's paw" "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Id.* (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)). Goodman argues that Pabst retaliated against him for his objections to her discriminatory remarks by filing a false complaint with Morel. Doc. No. 74 at 8. According to Goodman, on November 10 Pabst told him, "all you black people ever do is put a lot of cream in your coffee." Doc. No. 68-1 at 11. He responded by telling her not to stereotype him and then ignoring her the rest of the day. Doc. No. 68-2 at 2. Goodman asserts that Pabst assumed he would report her to HR, so she made a false statement to Morel that Goodman threatened to shoot up the job site in order to cause Morel to fire Goodman. Doc. No. 74 at 11, 19.

The "cat's paw" theory is "typically applied in direct evidence discrimination cases rather than indirect evidence cases under the *McDonnell Douglas* framework." *Quinonez-Castellanos v. Performance Contractors, Inc.*, No. C16-4097-LTS, 2017 WL 6519033, at *13 (N.D. Iowa Dec. 20, 2017); *see also Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011) (noting the tension between the *McDonnell Douglas* framework and the cat's paw theory of liability but declining to resolve it). No direct evidence has been presented here. In fact, both parties have argued this case under the *McDonnell Douglas* framework. Doc. Nos. 63-1 at 6; 74 at 4–5, 7. Therefore, I am not convinced the cat's paw theory even applies. Neither party has addressed the issue.

Further, there is no evidence that Pabst was a supervisory employee over Goodman. Instead, she was a crane operator who worked with Goodman. Doc. Nos. 68-1 at 2; 79 at 1. PCI indicates that Pabst was not Goodman's supervisor and had no authority to hire, terminate or discipline Goodman. Doc. No. 68-1 at 3. While Goodman

denies this assertion, he does not cite evidence to show she was a supervisor. He merely states that "by failing to conduct any meaningful independent review . . . [PCI] deferred its decisionmaking authority" to Pabst. *Id.* This is a legal conclusion, not evidence supporting a finding that Pabst had a supervisory role. *See* Doc. No. 70-1 at 99 (indicating that PCI terminated Goodman's employment based on the allegations by Pabst and Racca); Doc. No. 68-2 at 11–14 (statements of fact describing Pabst's report and the alleged deficiencies in Morel's investigation).

Based on the record before me, I find that Pabst is not a supervisory employee. Even if the cat's paw theory is applicable without direct evidence, I am not persuaded that it applies to non-supervisory employees. The Supreme Court has stated that the cat's paw theory applies "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (footnote deleted; emphasis in original).[9] Similarly, the Eighth Circuit cases applying the cat's paw theory have involved employees who did not have decision-making authority but nonetheless were in a supervisory role over the plaintiff. *See Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) ("an employer cannot escape responsibility for discrimination[] when the facts on which the reviewers rely have been filtered by a manager"); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718 (8th Cir. 1998) (finding a teacher's race discrimination claim failed because the decision to terminate her belonged to the school board and not to the principal or assistant superintendent); *Euerle-Wehle v. United Parcel Serv. Inc.*, 181 F.3d 898 (8th Cir. 1999) (plaintiff accused supervisor of falsely reporting her for mishandling packages); *Dedmon*

---

[9] *Staub* involved a claim brought pursuant to the Uniform Services Employment and Reemployment Rights Act (USERRA). *Id.* at 411. The Supreme Court has not suggested that a different formulation of the cat's paw theory applies to Title VII claims. Indeed, the Court noted in *Staub* that USERRA is "very similar to Title VII." *Id.* at 417.

*v. Staley*, 315 F.3d 948, 949 (8th Cir. 2003) (plaintiff argued the county clerk who terminated her served as the cat's paw for an immediate supervisor); *Richardson v. Sugg*, 448 F.3d 1046, 1059–60 (8th Cir. 2006) (plaintiff basketball coach argued the university president acted as the cat's paw for the athletic director); *Qamhiyah*, 566 F.3d at 743–44 (analyzing whether "upper-level reviewers" were independent of "lower-level" reviewers of the plaintiff's tenure application); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 549, 552 (8th Cir. 2013) (stating the employee who was motivated by discriminatory animus was a supervisor over the plaintiffs); *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 797–98 (8th Cir. 2015) (stating that the employee accused of the improper motive was the plaintiff's supervisor). Similarly, the decision of this court that Goodman has cited involved an employee in a supervisory role. *See Coe v. N. Pipe Prods., Inc.*, 589 F. Supp. 2d 1055, 1065, 1093–94 (N.D. Iowa 2008) (plaintiff, a truck driver, argued the Human Resources Manager was the cat's paw of the Traffic Manager). Because there is no evidence that Pabst was in a supervisory position over Goodman, the cat's paw theory of liability does not apply.

Even if the theory could apply to this situation, Goodman has not raised a genuine question of fact that Pabst had an unlawful retaliatory motive.[10] First, Pabst made her report on November 11, a day before Goodman first complained to Morel about discrimination.[11] Therefore, any retaliatory motive on Pabst's part would have been in

---

[10] Goodman does not argue that the cat's paw theory applies to his discrimination claim. *See* Doc. No. 74 at 4–6 (discussing only Morel's actions with respect to the discrimination claim).

[11] Goodman's comments to Pabst on November 10, the day before Pabst made her report, and his silence towards her that day do not constitute "protected conduct" sufficient to support a retaliation claim. *See Van Horn v. Specialized Support Servs., Inc.*, 241 F. Supp. 2d 994, 1011 (S.D. Iowa 2003) ("In order for [his] conduct to be protected under Title VII, it must first be in opposition to an unlawful employment practice of the employer, not discrimination by a private individual."); *see also Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) (An employee's opposition to a co-worker's individual racist remarks, opposition which was expressed to the co-worker, did not constitute protected conduct). Goodman's written statements on November 12 and November 16 constitute his protected conduct.

anticipation of protected conduct that had not yet occurred. The parties have not discussed whether anticipatory retaliation is actionable under Title VII or the ICRA.[12] Even if it is, Goodman cites no evidence to show that Pabst believed he was going to report her to HR. Goodman did not tell her he was going to report her and had not reported her after previous, allegedly-racist comments. The only reports he made were his statements on November 12 and November 16. Doc. Nos. 68-1 at 11; 70-1 at 51–55.

The assertion that Pabst assumed Goodman would report her to HR is pure speculation, which I need not accept as fact. *See Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009). Because there is no evidence to show that Pabst knew or thought Goodman would report her, Goodman has not generated a genuine question of material fact that Pabst's report was made in anticipatory retaliation of his subsequent protected complaints to HR.[13]

### 3. *The prima facie case*

The parties do not dispute that Goodman engaged in protected activity by complaining to Morel about Pabst's alleged discrimination. The parties also do not dispute that he was subjected to adverse employment action when he was fired. However, defendants argue that as a matter of law, the third element of the prima facie case – a

---

[12] The District of South Dakota has found that anticipatory retaliation claims fall within the scope of Title VII. *Davis v. Crescent Elec. Supply, Co. ("CESCO")*, 200 F. Supp. 3d 975, 887–88 (D.S.D. 2016). However, the Eighth Circuit has not addressed the issue. In *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012), the Eighth Circuit found that "because [the plaintiff's] report of discrimination followed" the adverse action, the "timing negate[d] a finding of retaliation," suggesting that anticipatory retaliation might not apply. Here, Goodman's report of discrimination followed Pabst's accusation. However, other circuit courts have found or suggest that anticipatory retaliation claims are viable. *Sauers v. Salt Lake Cty.*, 1 F.3d 1122, 1128 (10th Cir. 1993); *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002).

[13] Goodman's argument that PCI "cannot assert an honest belief defense because the basis of that belief was a fabrication" appears to be more of a pretext argument, though Goodman uses the cat's paw theory to support that assertion. Doc. No. 74 at 9. I will address this issue below.

causal connection – is lacking. Defendants contend that any causal connection between Goodman's complaint and his termination is weakened because Goodman's protected activity did not take place until after PCI received reports of his threats and an investigation was already under way. Doc. No. 63-1 at 14–15. Defendants also argue that Goodman has produced "no evidence beyond assumptions" that would create a genuine dispute of material fact as to causation. *Id.* at 15. Goodman disagrees and relies on the following categories of evidence to argue that there is a genuine issue of material fact as to whether his complaints to Morel caused his termination:

- Morel decided to terminate Goodman's employment four days after Goodman made his first complaint and within two hours of Goodman's second complaint on November 16, 2015. *Id.* at 12.

- Pabst's allegations can reasonably be considered "a complete fabrication." Doc. 74 at 8.

- Morel deviated from established investigation policies and the investigation was insufficient. *Id.*

- Four other employees made complaints of discrimination and were discharged a short time later. *Id.*

I will first address the temporal proximity evidence. Goodman submitted two written statements alleging discrimination. The first was on November 12, 2015, four days before his discharge. Doc. No. 70-1 at 51. In that statement he stated that Pabst made racist comments to him and another black rigger. *Id.* at 52. Specifically, he alleged that Pabst told him "that's all you black people do" is drink[14] "coffee down with cream." *Id.* He also said that "[t]hings were said about me without my knowledge." *Id.* He submitted his second statement on November 16, the same day he was discharged. *Id.* at 54. In that statement he again alleged that Pabst made racist remarks and that he "felt

---

[14] This part of the written statement is illegible. The rest of the written statement deals with Goodman's relationship with his ex-wife and children.

[he] was falsely accused of something [he] didn't even do cause [sic] my operator felt I was going to HR on her." *Id.* at 55.

As stated above, timing alone may be sufficient to create an inference of retaliation at the prima facie case stage. *Wright*, 730 F.3d at 738–39. The Eighth Circuit has found that "a temporal proximity of four days is sufficient to make a prima facie case." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011). Here, Goodman was discharged within four days of his first complaint and the same day as his second complaint. The statements themselves are not entirely clear about his allegations and his first complaint came only after he was escorted off the job site. Ultimately, however, "[t]he burden to show a *prima facie* case is not difficult." *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017). I find that the close temporal proximity here is sufficient to establish a prima facie case.

### 4.      *Legitimate, Non-Retaliatory Reason*

PCI states that Goodman was fired for making threats of violence, specifically threats to "shoot up" the job site. Doc. No. 63-1 at 14. Firing an employee for threatening violence is a legitimate reason. *Clark v. Runyon*, 218 F.3d 915, 919 (8th Cir. 2000); *Dose v. Buena Vista Univ.*, 229 F. Supp. 2d 910, 926 (N.D. Iowa 2002). Thus, PCI has met its burden of providing a legitimate, non-retaliatory reason for discharging Goodman. The burden shifts back to Goodman to put forth evidence from which a reasonable jury could conclude that PCI's articulated reason for termination was pretext. *See Donathan*, 861 F.3d at 740.

### 5.      *Pretext*

Pretext can be established in a number of ways. A plaintiff may demonstrate that the employer's proffered reason has no basis in fact, *see Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005), that the employer's proffered reason changed substantially over time, *see Korbrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994),

or that the employer varied from its normal policies and practices to address plaintiff's situation. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001). "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Roeben v. BG Excelsior Ltd. P'ship.*, 545 F.3d 639, 643 (8th Cir. 2008) (quoting *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005)). "A plaintiff must also demonstrate 'that the circumstances permit a reasonable inference' of discriminatory animus." *Id.*

Goodman relies on the same categories of evidence he relied on to make a prima facie showing to demonstrate a fact question as to whether PCI's stated reason for terminating his employment was pretextual. Doc. No. 74 at 14. He emphasizes his argument that Morel's investigation was insufficient because he looked only for evidence that would confirm the allegations. *Id.* In particular, Goodman lists alleged inconsistencies with Pabst's and Racca's statements that Morel ignored during his investigation. *Id.* at 15. Goodman additionally argues that Morel ignored Sarah Borne's instructions to look into the discrimination complaints. *Id.* at 14.

Goodman claims that he did not make the threats Pabst and Racca reported and that Pabst and Racca lied. However, the question is not "whether the facts actually raised proper grounds to terminate" Goodman, but rather whether PCI "honestly and reasonably believed" it had proper grounds to terminate. *Jensen v. IOC Black Hawk Cty. Inc.*, No. 15-cv-2082-LRR, 2016 WL 6080815, at *13 (N.D. Iowa Oct. 17, 2016); *see also Johnson*, 422 F.3d at 762–63 ("Thus even if AT&T had no solid proof that Johnson made the bomb threats, and even if AT&T was mistaken in its belief that Michael Johnson had made the threats, any such mistake does not automatically prove that AT&T was instead motivated by unlawful discrimination."). Goodman argues that PCI "cannot assert an honest belief defense because the basis of that belief was a fabrication" and because Morel did not properly investigate the threats or Goodman's report of discrimination. Doc. No. 74 at 9, 14–15.

"The appropriate scope of an internal investigation . . . is a business judgment" and the court does not "review the rationale behind such a decision." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). Shortcomings in an investigation are not enough to establish retaliation. *Id.* In *Pulczinski*, the Eighth Circuit explained that "[e]mployers are allowed to make even hasty business decisions, so long as they do not discriminate unlawfully, and there is no evidence here that the company purposely ignored relevant information or otherwise truncated the inquiry because of an animus against" the plaintiff. *Id.*; *see also Roeben*, 545 F.3d at 643 ("Even if Roeben could show that the Peabody's investigation was poorly conducted or that its decision was impetuous, that alone would not allow him to survive summary judgment."). Thus, even if the investigative procedures demonstrate that the plaintiff was treated unfairly, that does not mean such evidence "support[s] a reasonable inference" of a prohibited motive. *Malloy v. United States Postal Serv.*, No. 4:11-CV-00160, 2013 WL 12087178, at *10 (S.D. Iowa Mar. 13, 2013).

Eyewitness reports to employers about alleged behavior support an employer's honest belief about a reported incident. *See Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004) ("It is undisputed that eyewitnesses reported to Harsco supervisors that Hitt threatened force."); *Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 842 (8th Cir. 2008) ("The evidence in the record shows Core-Mark's determination was based on the statements of two witnesses and information provided by" a manager); *Jensen*, 2015 WL 6080815, at *13 (Finding the fact that the employer investigated by soliciting statements from the plaintiff and two others supports the conclusion that the employer honestly believed the plaintiff engaged in prohibited behavior). Even if "the complaining employees . . . were lying through their teeth" the key question is whether Morel believed Goodman had made the threats and if that belief was the reason for his firing. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Here, Pabst made her report and Goodman was escorted off the job site on November 11, 2015, a day before Goodman made his initial complaint. The Eighth

Circuit has previously affirmed a grant of summary judgment on a retaliation claim when the employer had concerns about the employee before any complaint was filed. *Guimaraes*, 674 F.3d at 978; *see also Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 913 (8th Cir. 2018) (the plaintiff applied for FMLA leave "one day after her temporary replacement flagged wage and hour irregularities that would eventually lead to the investigation" and her termination). As for the subsequent investigation, Morel expressed that he typically attempts to get as much information as he can with the resources and witnesses available. Doc. No. 69 at 29–32. He stated that he interviewed both Pabst and Racca separately and they gave similar accounts of what Goodman had said to them. *Id.* at 128. It appears he took notes of both interviews and noted that Racca took Goodman's threat with a grain of salt. Doc. Nos. 70-1 at 63; 72 at 21–22. He had to decide between believing Goodman's account or the account of two witnesses. *See* Doc. No. 69-1 at 5. Morel determined that the reports of threats were credible. Further, at some point between November 12 and November 16, PCI contacted law enforcement to look into Goodman's background. Doc. No. 63-3 at 17. However, PCI did not get any additional information from law enforcement because Goodman had already left town. *Id.*; Doc. No. 72 at 31.

One of Goodman's complaints about Morel's investigation is that Morel did not tell Goodman what he was being accused of, which Morel disputes. This is clearly a question of fact. However, even taking Goodman's account as true, Morel chose not to disclose the alleged threats before Goodman reported discrimination. In fact, Goodman agrees that after he complained of discrimination, Morel told him of the accusations against him during a phone call the following day. Doc. No. 69-1 at 99. I find that Goodman has not raised a genuine question of material fact that Morel's credibility determinations were not made reasonably and in good faith. *See Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001). Goodman has not shown that Morel purposely ignored relevant information or "otherwise truncated the inquiry" for the purpose of retaliating against him for report discrimination. *Guimaraes*, 674 F.3d at

979. Even accepting that Morel's investigation could have been more thorough, Goodman has not presented evidence to support a finding that his discharge was motivated by retaliatory intent.

Finally, I will address Goodman's alleged "me too" evidence. He points to four other employees who complained of discrimination: Elvira Quinonez, Patrick Hafner,[15] Daniel Thomas and Frederick Thomas. Doc. No. 68-2 at 18–21. He argues that this evidence is relevant because all four worked at the same job site within the same 18-month period and were discharged within a month of making a complaint of discrimination to Morel. Doc. No. 74 at 12–13. The following is a summary of the information on record of the four employees:

- Elvira Quinonez was hired on May 12, 2015, and was fired on October 24, 2015. Doc. No. 73 at 23. She was given a three-day suspension for violating the company's hard hat policy, by arriving at work with colored pieces of tape on her hat. Doc. No. 69-1 at 191–194. She asked to speak to somebody in HR because she felt she was being discriminated against by not being allowed to explain or ask questions about the hard hat policy. *Id.* at 194. She then spoke with Morel in HR and completed a written statement. *Id.* at 197; Doc. No. 68-3 at 6. That same day Morel told her he would look into her claims of harassment and discrimination but would also terminate her employment for insubordination. *Id.* at 7. Morel explained that the insubordination was because she refused to leave the jobsite for her three-day suspension and because she put tape back on her hard hat after being told not to. *Id.* at 7–8.

- Patrick Hafner was a pipefitter hired on April 13, 2015, and terminated on June 16, 2015. Doc. Nos. 73 at 30; 68-3 at 12. According to Morel, He was fired for violating the company's cell phone policy, no solicitation policy and

---

[15] At one point, Patrick Hafner is identified as "Randy Hafner," (Doc. 68-2 at 19) but for the purposes of this order I will use the name "Patrick Hafner."

harassment and discrimination policy. Doc. No. 68-3 at 12. Morel stated that Hafner violated the no solicitation policy by picketing outside the jobsite. *Id.* at 13–14; Doc. No. 70-1 at 68. Hafner had complained to Morel about discrimination and harassment at various points throughout his employment. Doc. No. 68-3 at 14.

- Daniel Thomas was fired on April 8, 2016, for not meeting expectations as reported by an employee named Dock Kendrick. *Id.* at 16. On March 31, Morel took a statement from Daniel Thomas in which he complained of discrimination by his foreman Josh Byrd. *Id.* According to Daniel Thomas' affidavit, he made two complaints about racial harassment to Byrd regarding another employee's racial comments.

- Frederick Thomas worked at PCI from September 29, 2014, through October 26, 2015. Doc. No. 73 at 35. He made at least one complaint to HR about discrimination and harassment on September 28, 2015, and alleged that he had made others. *Id.* at 31. The stated reason for his termination was violating the company's "confined space" entry rules. Doc. No. 69-2 at 49.

The relevance of "me too" evidence "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Courts have allowed "me too" evidence under Rule 404(b) to prove the defendant's motive or intent. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286-87 (8th Cir. 2008); *Buckley v. Mukasey*, 538 F.3d 306, 309 (4th Cir. 2008). This evidence is typically presented in the form of testimony from other employees and is neither *per se* admissible nor *per se* inadmissible. *See Mendelsohn*, 552 U.S. at 388. Factors to consider include: "(1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decisionmaker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff

were otherwise similarly situated." *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-45 (D.D.C. 2011) (citing *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010)). "[T]the test for whether employees are similarly situated is strict; the employees must be 'similarly situated in all material respects.'" *Smith v. URS Corp.*, 803 F.3d 964, 970 (8th Cir. 2015).

There are a number of distinguishing facts between the four other employees and Goodman's situation that precludes a finding that they are similarly situated. For example, of those four employees, Frederick Thomas' firing was closest in time to Goodman's. Daniel Thomas was fired almost a year after Goodman and Quinonez and Hafner were fired around six to seven months before Goodman. While Quinonez was fired close in time to her complaint, like Goodman, Frederick Thomas was not. It is unclear from the record what the complaint-to-discharge timeframes were for Daniel Thomas and Hafner.

Additionally, unlike Quinonez and Hafner, Goodman was fired for behavior that was separate from the subject matter of his complaints of discrimination, while Daniel Thomas' alleged behavior is not clear from the record. Ultimately, I find that Goodman has failed to show that these four employees were similarly situated to the extent necessary to show pretext. As such, and even after viewing the evidence most favorably to Goodman, I find that he has not created a genuine issue of material fact as to whether PCI's stated reason for discharge was pretext for retaliation. Defendants are entitled to summary judgment on the retaliation claims set forth in Counts I and III.

## B. *Discrimination*

### 1. *Legal Standards*

To show race discrimination under the ICRA, the plaintiff must show that the adverse employment action was motivated by the employer's discriminatory animus or intent. *See Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014) ("In a disparate treatment case, the plaintiff bears the burden of showing he or she has been harmed by

discriminatory animus of the employer."). The discriminatory intent does not have to be the sole factor, only a "determining factor." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009).

The standard is the same for Title VII discrimination claims. Title VII prohibits employment discrimination "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e–2(a). The plaintiff must show that one of those factors was a motivating factor for any employment practice. *Staub*, 562 U.S. at 417. When a plaintiff presents indirect evidence of race discrimination, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014). To establish a prima facie case of race discrimination, the plaintiff must show that he "(1) is a member of a protected class; (2) was meeting [his] employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of [his] protected class." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013).

If the employer presents a legitimate, non-discriminatory reason for the adverse employment action, then the plaintiff must show that reason is merely pretext for discrimination. *Young*, 754 F.3d at 578. To show pretext the plaintiff may present evidence that the employer "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Id.*[16] Goodman relies on the first two categories of evidence to show both a prima facie case of discrimination and pretext. Doc. No. 74 at 4. As discussed in the retaliation section, PCI states that Goodman was fired because of the threats he allegedly

---

[16] While this type of evidence is typically considered at the pretext stage of the *McDonnell Douglas* analysis, it can "also satisfy the inference-of-discrimination element of the prima-facie case." *Young*, 754 F.3d at 578. Goodman relies on this type of evidence to establish his prima facie case and pretext. Doc. No. 74 at 5.

made against the job site which is a legitimate, non-discriminatory reason for the adverse employment action.

## 2.  *Failure to follow policy*

Goodman argues that he has raised a sufficient inference of discrimination because Morel did not follow PCI's policies when he investigated the alleged threats.  Doc. No. 74 at 5.  He argues that Morel (1) did not tell Goodman about the allegations when he asked for Goodman's first statement; (2) did not "ask the accusers any significant questions;" (3) did not investigate Pabst's motive to lie; (4) did not speak to Silas Thompson, a witness Goodman alleged could confirm Pabst's racial remarks; (5) ignored "external evidence that contradicted Pabst's accusations;" (6) did not follow PCI's progressive disciplinary policy and (7) required Goodman to present proof that he had not made the threats, rather than require Pabst or Racca to present proof.  *Id.*  Goodman also argues that Morel judged the complaints against Goodman "against a different standard than the complaints against other white employees."  *Id.* at 6.

Goodman has not provided an actual, written PCI policy that was allegedly violated during the investigation.  The only policy Goodman cites is PCI's progressive disciplinary policy.  *Id.* at 5.  However, that policy states that PCI reserves the right to proceed directly to termination if deemed necessary.  Doc. Nos. 70-1 at 45–46; 68-3 at 66.  Goodman also relies on Morel's description of how he generally conducts investigations.  Morel testified that a history of complaints can be a factor in determining credibility, that he tries to "get deep in the situation," that he likes to talk to the complainant to get as much information as he can in order to compare that information to a written statement and that he does what he can with what he has.  Doc. No. 69 at 29–32.

Here, Morel interviewed Pabst and Racca separately and the two of them gave similar accounts of what Goodman allegedly said.  *Id.* at 128.  Morel did not try to "get context" for the alleged threat to shoot up the workplace and Pabst testified that she was

not asked to elaborate on her comment that Goodman had previously threatened violence numerous times.  *Id.* at 137; Doc. No. 70-3 at 70.  Morel stated that when he has two people telling him the same, fairly consistent story and one person denying it, he will probably side with the two people making the allegation.  Doc. No. 69 at 26–27.  Morel did not ask Pabst or Racca why they chose that day to report Goodman's threats.  Doc. No. 69-1 at 16.

Goodman notes that he identified Silas Thompson as a witness who could corroborate Pabst's racist comments.  *Id.* at 35.  Morel did not speak to Thompson and he cannot remember why he chose not to.  *Id.* at 21–22, 24.  Morel stated that even if Pabst had made racist comments and even if Goodman had confronted her about them, it would not have changed his evaluation of her credibility.  *Id.* at 25–26.  There is also a dispute as to whether Morel told Goodman about the allegation against him when Goodman gave his first written statement.  Morel states he did tell Goodman about the allegation but Goodman denies this.  *Id.* at 99; Doc. No. 63-3 at 13.

Ultimately, the evidence about Morel's typical investigative process demonstrates nothing more than his goals and preferences when conducting investigations.  Those statements do not establish the existence of a policy that Morel violated during the investigation.  At most, Goodman has shown that Morel's investigation may have been insufficient, which is not enough to establish discrimination based on race.  *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017) ("Even if the investigation were somehow flawed, a shortcoming in an internal investigation alone, without additional evidence of pretext, would not suffice to support an inference of discrimination on the part of the employer.").  Indeed, even if Goodman could show that Morel's investigation fell short of PCI's stated requirements, he would still have to show that the policy violations occurred due to racial animus.  An "employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee . . . as long as it does not unlawfully discriminate in doing so."  *Id.* at 1126–27 (quoting *Shaffhauser v. United Parcel Serv., Inc.*, 794 F.3d

899, 902 (8th Cir. 2015)). Based on the record before me, I find that Goodman has failed to show discrimination on the basis of race due to PCI's alleged failure to comply with its own policies.

### 3. *Similarly situated employees*

Goodman also relies on the alleged disparity of treatment as between himself and similarly situated employees. "[T]he test for whether employees are similarly situated is strict; the employees must be 'similarly situated in all material respects.'" *Smith*, 803 F.3d at 970. Those employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clay v. Credit Bureau Enters., Inc.*, 882 F. Supp. 2d 1083, 1097 (N.D. Iowa 2012) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011)).

Goodman alleges that three employees were similarly situated but treated differently than he was. Doc. No. 74 at 6. The document he cites describes four employees who were disciplined for some type of threats: Hector Carbajal, Raymond David, James Lee and Joseph Walker. Doc. No. 73 at 21–22. Carbajal is Hispanic, Lee and Walker are Caucasian and David's race is unknown. *Id.* at 23. There is very limited information available about these employees. Carbajal was terminated for verbally threatening to cause physical harm to a supervisor and getting into the face of the supervisor. *Id.* at 21. David was suspended for three days for "arguing with an EE threatening an EE." *Id.* Lee was suspended for three days for threatening a fellow employee and Walker was suspended for three days for threatening another worker. *Id.*

It appears that all of these incidents took place at the Port Neal location. *Id.* Other than as summarized above, however, Goodman has provided no information about who was threatened or what threats were made. Nor has he provided information about the positions of these employees, their supervisors, when the threats occurred, any past disciplinary history or to what extent Morel was involved. "To be probative of evidence

24

of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" *Bogren v. Minnesota*, 236 F.3d 399, 406 (8th Cir. 2000) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)). Goodman's alleged threat to "shoot up" the Port Neal job site is, of course, an extremely serious and concerning situation. Goodman has not produced sufficient information to permit a finding that the threats made by any of the other employees were of "comparable seriousness." I find that Goodman has not established that there were similarly situated employees so as to support a discrimination claim based on disparate treatment.

Once a defendant has presented a legitimate, non-discriminatory reason for adverse action, the plaintiff must demonstrate by a preponderance of the evidence that the stated reason was pretext for discrimination. *Jones v. Cargill, Inc.*, 490 F. Supp. 2d 994, 1004 (N.D. Iowa 2007). "A reason cannot be *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* (quoting *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005)) (emphasis in original). Even viewing the evidence most favorably to Goodman, I find that he has not created a question of fact that PCI's reason for discharging Goodman was pretext for discrimination on the basis of race. PCI is entitled to summary judgment on the discrimination claims set forth in Counts I and III.

## C. *Defamation*

To establish a defamation claim under Iowa law, a plaintiff must prove "(1) publication, (2) of a defamatory statement, (3) which was false and (4) malicious, (5) made of and concerning the plaintiff, (6) which caused injury." *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013); Doc. No. 37 at 14. Defendants argue they are entitled to summary judgement because Goodman cannot show either (1) that Pabst and Racca acted with malice or (2) that PCI published a defamatory statement. Doc. No. 63-1 at 16–17. Defendants also argue that, at the very least, they are entitled to a qualified

privilege and, because Goodman cannot establish actual malice, they are entitled to summary judgment.  *Id.*

Goodman argues that this court has already ruled the alleged defamatory statements were "published."  Doc. No. 74 at 16–17.  He contends that Pabst and Racca were employees of PCI at the time they made their allegedly defamatory statements such that PCI is liable for that publication.  *Id.*  He also argues that the issue of qualified privilege is typically left to the jury to decide and there is "ample evidence" to show that Racca and Pabst fabricated their reports to get Goodman fired before he could report Pabst's racist comments to HR.  *Id.* at 17, 19.  He contends that Racca and Pabst are not protected by qualified privilege because their false reports could not have been made in good faith.  *Id.* at 19–21.

### 1.    *Publication*

On April 11, 2018, the Honorable Mark W. Bennett, to whom this case was previously assigned, entered an order denying Racca's motion to dismiss for failure to state a claim.  Doc. No. 37.  Racca had argued that Goodman did not assert a plausible claim because his allegedly defamatory statements about Goodman were intra-company communications and, therefore, were not published.  *Id.* at 4.  Judge Bennett concluded that the Iowa Supreme Court's decisions on this issue "clearly [do] not support the contention that intra-company or intra-corporate communications by a co-worker only to the employer are not 'publications' as a matter of Iowa law for purposes of a defamation claim."  *Id.* at 13.  In fact, he found that "Iowa does consider allegedly defamatory statements by co-workers to the employer to be published."  *Id.*

Defendants now argue that the defamation claim against PCI should be dismissed because PCI did not publish the statements to a third party.  Doc. No. 63-1 at 16.  However, defendants do not present any substantial argument or case law on this issue.  Goodman contends that because this court has already held Racca's statements were published, and employers are liable for the statements their employees publish within the

scope of their employment, the "publication" requirement is satisfied with respect to PCI. Doc. No. 74 at 16–17. Goodman further argues that whether or not a statement was published within the scope of employment is a jury question.

I have reviewed Judge Bennett's analysis and find no reason to differ with his conclusions as to Iowa law. Racca's, and by extension Pabst's, statements to their employer, PCI, were published. While that is true, Judge Bennett's opinion addressed Goodman's defamation claim with respect to Racca, not with respect to PCI. Goodman argues that because Racca's and Pabst's statements are considered "published," PCI is liable for that publication because Racca and Pabst were acting within the scope of their employment when they made their statements. Doc. No. 74 at 16–17.

An employer may be liable for its employee's defamatory statements if the employee was acting within the scope of his employment when making the statements. *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). The conduct must "be of the same general nature as that authorized or incidental to the conduct authorized" or "necessary to accomplish the purpose of the employment and is intended for such purpose." *Stueckrath v. Bankers Tr. Co.*, 728 N.W.2d 852, No. 06-0803, 2007 WL 258292, at *4 (Iowa Ct. App. Jan. 31, 2007) (quoting *Godar v. Edwards*, 588 N.W.2d 701, 705–06 (Iowa 1999)). The key here is the employee is speaking with a purpose to serve the employer. An employee who is "engaging in misconduct such as lying *to* his or her own employer, as opposed to lying *for* the employer, may well be found to be acting outside the scope of employment." Rodney A. Smolla, 2 Law of Defamation § 15:23 (2d ed. 2018) (emphasis added).

Here, Goodman argues that Racca and Pabst lied to PCI when they stated that he threatened to shoot up the work place. Accepting Goodman's position as true, as is required for summary judgment purposes, there is no evidence that they were authorized to lie about a co-worker or that they did so with the purpose of serving their employer, PCI. The fact that Pabst and Racca made their statements while at the jobsite is not sufficient to show the statements were made within the scope of employment. *See Garnett*

*v. Remedit Seniorcare of Virginia, LLC*, 892 F.3d 140, 146 (4th Cir. 2018). PCI may have requested that Pabst and Racca submit their reports in writing (Doc. Nos. 70 at 18; 69-1 at 157–58), but that does not show they were authorized to make false statements about what Goodman said. Nor does it show they did so to accomplish a purpose of their employment.

In *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 575 (Tex. 2002), an employee made a defamatory statement about a co-worker during the employer's investigation of workplace misconduct, the same conduct alleged here. The Texas Supreme Court found that the employee was not acting within the scope of his employment because there is "a critical distinction between defaming someone to one's employer and defaming someone for one's employer." *Id.* at 579. Other courts have made similar findings. *See Christensen v. Weichert Ins. Agency, Inc.*, No. A-4953-11T2, 2013 WL 6122593, at *8 (N.J. Super. Ct. App. Div. Nov. 22, 2013) ("False accusations of wrongdoing made by one employee against another employee would not ordinarily be within the scope of employment"); *Mazur v. Cuthbert*, 186 A.3d 490, 504 (Pa. Commw. Ct. 2018) ("[A]n employee cannot be considered to be furthering an employer's interest in such a situation, nor can such conduct be considered merely incidental to authorized conduct.").

I find the analysis and holdings set forth in these cases to be instructive. While there appears to be no Iowa authority directly on point, I predict that the Iowa Supreme Court would concur that an employee does not act within the scope of his or her employment if the employee makes false statements to the employer about a co-worker, at least in the absence of evidence that the employee was authorized to do so. Thus, even assuming Racca and Pabst published false statements about Goodman to PCI, such conduct cannot be imputed to PCI because it was not within the scope of Racca's and Pabst's employment. Because there is no evidence that PCI re-published the statements, PCI is entitled to summary judgment on Goodman's defamation claim, as set forth in Count II. This leaves for consideration Goodman's defamation claim against Racca.

## 2. *Qualified privilege*

Racca contends that he is entitled to qualified privilege as to the defamation claim against him. A qualified privilege exists when an otherwise defamatory statement was (1) made in good faith; (2) "the defendant had an interest uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only." *Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004). If good faith is present, "the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not." *Jenkins v. Wal-Mart Stores, Inc.*, 910 F. Supp. 1399, 1426 (N.D. Iowa 1996). Even statements that are untrue may be protected by qualified privilege so long as there is no malice and the speaker believed them to be true. *Thompto v. Coborn's Inc.*, 871 F. Supp. 1097, 1126–27 (N.D. Iowa 1994). To generate a question of fact regarding good faith, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Mills v. Iowa*, 924 F. Supp. 2d 1016, 1037 (S.D. Iowa 2013) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Generally, the question of whether qualified privilege applies is for the court to decide, while the question of whether the privilege was abused is for the jury. *Barreca*, 683 at 118. Qualified privilege is abused when a defamatory statement is published with "actual malice." *Id.* To show actual malice, the plaintiff "must prove the defendant acted with knowing or reckless disregard of the truth of the statement." [17] *Id.* at 121. A

---

[17] In *Barreca*, the Iowa Supreme Court changed the definition of actual malice. A finding of malice previously depended on the motive of the speaker but in *Barreca*, the Court adopted a definition requiring only that the plaintiff show the "defendant acted with knowing or reckless disregard of the truth of the statement." 683 N.W.2d at 121; *see also Park v. Hill*, 380 F. Supp. 2d 1002, 1018–19 (N.D. Iowa 2005) (noting the changed definition). Therefore, even if Racca did not act out of "ill will towards Goodman" (Doc. No. 63-1 at 18), he acted with malice if he knew his statements were false or made them with reckless disregard of their truth.

statement is not made in good faith when the defendant "entertained serious doubts" about the truth of their statements. *See Mills*, 924 F. Supp. 2d at 1036–37.

Goodman argues that qualified privilege does not apply because the allegedly-defamatory statements were not made in good faith. Doc. No. 74 at 17. He states that there is "ample evidence to support a conclusion that Racca and Pabst fabricated their reports," which creates a question of fact on whether the statements were made with good faith. *Id.* at 19. Goodman argues that he did not make the threats at issue, that Pabst and Racca were friends and that they communicated with each other prior to making their reports. *Id.* at 19. Goodman also points to the fact that both Pabst and Racca stated they initially reported Goodman's threats to Leon Strickland, who "denied ever receiving such complaints." *Id.* He adds that because Racca did not believe anyone was in danger due to Goodman's alleged threats but knew that's how his report would be interpreted, Racca acted with malice. *Id.* at 20.

The situation here differs from that in *Taggart v. Drake Univ.*, 549 N.W.2d 796 (Iowa 1996), a case defendants cite. In *Taggart*, an employee made statements to the employer as part of a mandatory evaluation of another employee's performance. *Id.* at 804. The Court noted that the employee making the statements "was required to pass judgment, based on his observations and academic experience." *Id.* Obviously, this required some amount of subjectivity. Thus, while the employee being evaluated disagreed with the statements, there was no evidence they were made with malice. *Id.*

Here, however, Pabst and Racca were not required to evaluate Goodman's performance and made no subjective judgments about that performance. Instead, they affirmatively reported to PCI that they heard Goodman threaten to "shoot up" the Port Neal jobsite. This court has held that summary judgment is not appropriate on the basis of qualified privilege if there is a question of fact as to whether the speaker manufactured grounds for discharging the plaintiff. *Mercer v. City of Cedar Rapids*, 104 F. Supp. 2d 1130, 1170 (N.D. Iowa 2000), *aff'd*, 308 F.3d 840 (8th Cir. 2002); *see also Newell v. JDS Holdings, L.L.C.*, 834 N.W.2d 463, 473 (Iowa Ct. App. 2013) (denying summary

judgment on defamation because there was a material question of fact as to whether the speaker published statements about the plaintiff knowing they were false); *King v. Sioux City Radiological Grp., P.C.*, 985 F. Supp. 869, 880 (N.D. Iowa 1997) (finding a genuine issue of material fact as to the "good faith" of the speakers when an investigation revealed there was little substance to their allegations).

Viewing the evidence in the light most favorable to Goodman, Goodman confronted Pabst about her allegedly racist statements on November 10. The following day, Pabst and Racca falsely reported to PCI that Goodman threatened to shoot up the worksite. Pabst and Racca were friends and communicated before separately submitting their false reports. Racca did not believe Goodman posed a danger but knew reporting that Goodman made the statement at issue would create that impression. All of this creates a question of fact as to whether Racca made his statements in good faith and whether they were made with actual malice. *See Bertrand v. Mullin*, 846 N.W.2d 884, 899 (Iowa 2014) (citing *McCarney v. Des Moines Register & Tribune Co.*, 239 N.W.2d 152, 156 (Iowa 1976)). Racca is not entitled to summary judgment on Goodman's defamation claim.

## V.  CONCLUSION

For the foregoing reasons, defendants' motion (Doc. No. 63) for summary judgment is **granted in part** and **denied in part**, as follows:

1.     The motion is **granted in its entirety** as to all claims against defendant Performance Contractors, Inc. As such, Performance Contractors, Inc., is hereby **dismissed** as a defendant with regard to all counts of the amended complaint.

2.     The motion is **denied** as to the defamation claim against defendant Derek Racca, as set forth in Count II of the amended complaint.

3.     This case will proceed to trial on Count II only, with Derek Racca as the sole defendant.

**IT IS SO ORDERED.**

**DATED** this 30th day of January, 2019.

_____
Leonard T. Strand, Chief Judge